UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Keith Eugene Washington, | Case No. 18-cv-1464 (DWF/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Stephen Joseph Cranne, et al., | |
| Defendants. | |

Keith Eugene Washington, MCF-Stillwater, 970 Pickett Street, Bayport, MN 55003 (*pro se* Plaintiff); and

Anthony J. Novak and Mark A. Solheim, Larson King, LLP, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101 (for Defendants).

This matter comes before the Court, United States Magistrate Judge Tony N. Leung, on the Motion for Summary Judgement by Defendants Stephen Craane, M.D., Deborah MacNeill, M.D., and Lou Augdahl, M.D. (ECF No. 46). This motion has been referred to the undersigned for a report and recommendation to the Honorable Donovan W. Frank, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C § 636 and D. Minn. LR 72.1. Based on all of the files, record, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the motion be **GRANTED**.

I. PROCEDURAL HISTORY

On May 29, 2018, Plaintiff Keith Eugene Washington filed a complaint under 42 U.S.C. § 1983 against seven Defendants, alleging they were deliberately indifferent to his medical needs. (ECF No. 1). He sought both monetary and injunctive relief. (ECF No. 1,

p. 10). Four Defendants were dismissed following Rule 12 proceedings. (ECF No. 40). The remaining Defendants – Craane, MacNeil, and Augdahl – answered the complaint (ECF No. 16) and moved for summary judgment on December 3, 2019. (ECF No. 46). They argue there is no material fact in dispute and that they are entitled to judgment as a matter of law.

Defendants twice attempted to serve their summary judgment motion and supporting documents by mailing them to Washington at the Minnesota Correctional Facility located at Osgood Avenue in Stillwater. (ECF Nos. 53, 62, p. 2). The documents were returned each time. (ECF No. 62-1, pp. 1-2). Defendants then attempted to serve the documents at the Minnesota Correctional Facility located on Pickett Street in Bayport, where the Minnesota Department of Corrections indicated Plaintiff had been transferred. (ECF No. 62-1, p. 3). Again, the documents were returned. (ECF No. 62-1, p. 3).

On January 21, 2020, to ensure Washington received the summary judgment motion and supporting documents, the Court directed the Clerk of Court to mail those materials directly to Washington. (ECF No. 63). The Court then set new briefing deadlines for the summary judgment motion. The Court ordered Washington to respond to the motion on or before February 18, 2020 and Defendants to reply on or before March 4, 2020. Washington did not respond to the motion.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Under Rule 56(a), courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). In considering such a motion, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quotation and citation omitted). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *Torgerson*, 643 F.3d at 1043.

### B. Facts[1]

Washington is an inmate with the Minnesota Department of Corrections ("DOC"). His claims relate to time during which he was housed at the DOC's Oak Park Heights facility. Defendants are employed by Centurion of Minnesota, a corporation that provides health care services to Minnesota inmates. Each Defendant treated Washington while he was housed at the DOC's Oak Park Heights facility.

Washington alleges that Defendants denied him adequate medical care and recklessly prescribed him medications without explaining their side effects. (ECF No. 1, p. 4). As to Defendants MacNeill and Augdahl, he claims that they should have prescribed him Wellbutrin to treat his depression, which Washington alleges worked well for him previously. (ECF No. 1, p. 7). Washington indicates that instead, Augdahl and her subordinate, MacNeill tried "several other medications . . . that caused life altering side effects." (ECF No. 1, p. 7). As to Defendant Craane, Washington alleges that Craane refused to treat him for a gunshot wound and that Craane prescribed him "psychological medications" for nerve damage and pain management that caused "life altering side effects. (ECF No. 1, p. 10).

Between 2005 and 2008, Washington participated in trials of Elavil, Depakote, Thorazine, Risperdal, Remeron, Prozac, and Trazadone. (ECF No. 50, p. 113). It then appears that he went without medication or medical care until 2015. (*Id.*).

---

[1] Many facts cited herein come from sealed filings—mostly medical records. Because Washington has put his medical status and treatment at issue with his claims, the Court does not redact any of the facts referenced in this Report and Recommendation, nor seal all or part of this Report and Recommendation. The sealing of the underlying filings, however, will be addressed via separate order.

Washington first received care from Augdahl in September 2016. (*Id*., pp. 126-128). At that time, he was taking Depakote and Effexor to treat anxiety and depression. (*Id*., p. 126). Because Effexor was causing him hunger pains, stomach aches, and difficulties sleeping, Washington asked to be put on Wellbutrin, which he felt had been more effective. (*Id*.). Augdahl declined to prescribe that medication, noting that he had history of seizures and there was "no evidence from the community that it was specifically beneficial." (*Id*., p. 128). Instead, Augdahl directed Washington to continue Depakote and Effexor. (*Id*.).

Approximately one month later, prison officials found Effexor and a "snorting device" with Washington. (*Id*., p. 123). He also exhibited suicidal and aggressive behavior. (*Id*.). Augdahl discontinued the Effexor for safety reasons and because she was concerned that he might divert it or "inappropriately provid[e] [it] to other residents." (*Id*.). She indicated, that while she would reassess Washington's complaints of depression in the future, she would not support Wellbutrin or Effexor given his "high risk of misuse of potentially abusable medications." (*Id*.).

Washington then saw MacNeill in November 2016. Again, he indicated that Depakote was ineffective and asked to be put on Wellbutrin. (*Id*., p. 121). MacNeill declined to do so, in part because of his recent "misuse of Effexor." (*Id*.). Washington continued to take Depakote. (*Id*.).

In December 2016, Washington indicated he was interested in trying medications other than Wellbutrin. (*Id*, p. 120). Augdahl began tapering Washington off Depakote and began treating him with Lamictal. (*Id*.). MacNeill, however, discontinued that treatment in February 2017, after Washington reported that Lamictal caused significant side effects and

5

refused to take his prescribed dose. (*Id*., p. 118). At a subsequent appointment, Augdahl suggested that Washington participate in individual counseling and try Lexapro. (*Id*, p. 114). She indicated she would follow up with Washington in approximately two months. (*Id*.). At multiple subsequent appointments, Washington indicated that Lexapro had proven effective and that it had caused him little to no side effects. (*Id*., pp. 110-112).

Washington began to refuse his Lexapro dose in August 2017. (*Id*., p. 109). Ultimately, that medication was discontinued. (*Id*.). Washington then began to report that he had a "lot of 'dejected thoughts'" and other depressive symptoms. (*Id*., p. 107). Augdahl suggested that he try Cymbalta for approximately six weeks. (*Id*.). Washington agreed. (*Id*.).

Augdahl discontinued the Cymbalta in October 2017, after prison staff located what appeared to be Cymbalta on Washington during a search. (*Id*., p. 106). Augdahl noted that, given Washington's "history of diversion," and the extensive amount of time that he spent incarcerated without antidepressant medications, that he not be prescribed additional antidepressants unless "there are clear clinical signs and evidence that would warrant a trial." (*Id*.).

In December 2017, Augdahl restarted Washington on Cymbalta after he explained the tablets found on him in October were Bentyl, not Cymbalta. (*Id*., p. 103-04). Washington remained on Cymbalta until March 27, 2018, when he reported that it was causing him extensive side effects. (*Id*., p. 100). Washington then remained off antidepressants until August 2018, when he began taking Effexor again. (*Id*., p. 95).

6

Around the same time Augdahl and MacNeill were treating Washington, Craane was providing care for a gunshot wound that Washington suffered in 1994. (*Id.*, p. 12). In December 2016, Craane prescribed Neurontin to help Washington cope with chronic pain in his lower left extremity. (*Id.*). That medication was stopped after Washington was suspected of diverting it in September 2017, the same time he was suspected of diverting Cymbalta. (*Id.*, pp. 8, 106).

Washington then met with Craane in October 2017. (*Id.*, p. 8). He asked for "anything else that he could use to modify his pain." (*Id.*). Craane ordered a trial of Pamelor. (*Id.*). Washington took that medication until November 2017, when he reported headaches and blurred vision. (*Id.*, p. 7). Washington also complained that Pamelor was a psychiatric medication and not a pain medication. (*Id.*, p. 7). He admitted, however, that he had not read the information that Craane provided regarding the uses of Pamelor. (*Id.*). Craane then spoke with Washington about options for his pain, noting that he had indicated Pamelor was ineffective; that he could not be prescribed nonsteroidal anti-inflammatories because Washington claimed to be allergic to them; and that he could not be prescribed Neurontin because of his suspected diversion. (*Id.*). Washington told Craane not to consult with psychiatry regarding potential pain medication, but instead told him to find something that was guaranteed to work with no adverse side effects. (*Id.*). When Craane told him this might not be possible, Washington became aggressive and the appointment was terminated. (*Id.*). Washington then refused to speak with Craane at a follow-up appointment in December 2017. (*Id.*, p. 6).

Craane agreed to prescribe Washington Neurontin again in March 2018, with the warning that if he were caught diverting it again, it would no longer be prescribed. (*Id*., p. 5). Shortly thereafter, Washington was then caught pouring crushed Neurontin into toilet paper to swallow. (*Id*., p. 4). Craane warned Washington to stop diverting the medication, but did not terminate the prescription. (*Id*., p. 4). Craane then discontinued the medication approximately one month later after Washington was again found diverting it. (*Id*., p. 3). To assist with the pain, Craane referred Washington to physical therapy. (*Id*., p. 2).

### C. Analysis

Washington brings his claim under 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. The "purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).[2]

Washington claims that Defendants denied him adequate medical care and were deliberately indifferent to his medical needs. The Eighth Amendment prohibits deliberate indifference to serious medical needs—i.e., a serious illness or injury—of prisoners. *Estelle*

---

[2] On page 4 of his complaint, Washington also suggests that Defendants' conduct constituted medical malpractice and negligence. (ECF No. 1). It is not clear that he intended to bring medical malpractice claims in this lawsuit. If he did, they would fail, as he has failed to submit two expert affidavits in support of his claims. *See Bellecourt v. United States*, 784 F. Supp. 623, 636 (D. Minn. 1992); Minn. Stat. § 145.682.

8

*v. Gamble*, 429 U.S. 97, 104–05 (1976). Deliberate indifference is "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* (footnotes omitted); *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) ("[A] prison official violates the Eighth Amendment by being deliberately indifferent either to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm."). To prove a deliberate indifference claim, Washington must show "that officials knew about excessive risks to his health but disregarded them, and that their unconstitutional actions in fact caused his injuries." *Senty-Haugen v. Goodno*, 462 F.3d 876, 889–90 (8th Cir. 2006) (internal citations omitted).

The deliberate indifference standard has an objective and subjective prong. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). The plaintiff must first prove "'that he suffered from an objectively serious medical need' and 'that [Defendants] actually knew of but deliberately disregarded his serious medical need.'" *Id.* (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014)). The determination that a medical need is objectively serious is a factual finding. *Jones v. Minn. Dept. of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

"The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more . . . than gross negligence," requiring a "mental state akin to criminal recklessness." *Saylor*, 812 F.3d at 644 (citations and quotations omitted). Deliberate indifference goes beyond gross negligence, and must be more than simply a disagreement with treatment decisions. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006)

9

(citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). Thus, the relevant questions here are whether (1) Washington "had [a] serious medical need or whether a substantial risk to h[is] health or safety existed, and (2) whether [Defendants] had knowledge of such serious medical need or substantial risk to [Washington's] health or safety but nevertheless disregarded it." *Nelson*, 583 F.3d at 529.

The Court need not determine whether the two conditions alleged by Washington – depression and pain caused by the gunshot wound – constitute serious medical needs. Because Defendants did not deliberately disregard Washington's medical needs, summary judgment is appropriate.

The record as a whole does not establish any unexplained gaps in treatment or care. Nor does it show any instances where Defendants refused to respond to an objectively serious medical need or that Washington's condition became worse because of any delay in treatment. *See Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). In fact, as set forth above, the record makes clear that Defendants were attentive to Washington's needs and engaged with him in a regular course of treatment. As to Washington's depression, Augdahl and MacNeill met with him regularly and prescribed him several different medications in attempts to meet his needs. They regularly reviewed his file and responded to his concerns. They also encouraged him to continue participating in counseling and suggested alternate ways he might cope his needs. MacNeill also acted quickly to discontinue medication when Washington complained that it caused unwanted side effects. Both doctors worked to identify another course of treatment. Likewise, as to the pain that

Washington suffered from the gunshot wound, the record also shows that Craane met with Washington multiple times and prescribed him multiple types of medication to assist him.

Furthermore, there are numerous instances in the record where Washington refused to take his prescribed medication, was uncooperative during his visits, or where he was suspected of diverting medication. Despite Washington's failure to comply with his prescribed course of treatment and his improper use of medications, Defendants did not ignore him or otherwise refuse to consult with him. Instead, they suggested alternate forms of treatment. In fact, in certain cases, Defendants restarted treatment regimens that had been discontinued because of concerns related to the diversion of medication. For example, Craane kept Washington on Neurontin even after he was found crushing and drinking it, while Augdahl restarted Washington on Cymbalta after Washington had been suspected of diverting it, taking him at his word that it was a different medication found on him during a search. Given these circumstances, Washington has failed to establish that Defendants were aware of, and deliberately ignored, a serious medical need.

In reality, Washington's claim centers not on the care he received, but largely on the fact that Defendants did not prescribe him the medications that he wanted. But a showing of deliberate indifference requires more than a mere disagreement about treatment decisions. *Gibson*, 433 F.3d at 646. Furthermore, "courts 'hesitate to find an [E]ighth [A]mendment violation when a prison inmate has received medical care.'" *Martinson v. Leason*, 22 F. Supp. 3d 952, 962 (D. Minn. 2014) (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). Though true that both Craane and Augdahl denied Washington's requests for certain medications, they both provided legitimate explanations each time they

11

did so. Augdahl explained why Wellbutrin was not recommended given Washington's history of seizures and previous treatment history, while Craane discontinued Neurontin only after Washington had been caught diverting it on multiple occasions. No reasonable jury would find from this record that Defendants deliberately disregarded Washington's serious medical needs. In fact, on this record, there is no genuine dispute that Washington received regular medical care from Defendants and other prison medical care providers. Accordingly, the Court recommends the motion for summary judgment be granted.

### III.  RECOMMENDATION

Based on the foregoing and all of the files, record, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Motion for Summary Judgement by Defendants Stephen Craane, M.D., Deborah MacNeill, M.D., and Lou Augdahl, M.D (ECF No. 46) be **GRANTED**, this matter be **DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.


Date: March 9, 2020                     *s/ Tony N. Leung*
                                        Tony N. Leung
                                        United States Magistrate Judge
                                        District of Minnesota

                                        *Washington v. Craane, et al.*
                                        Case No. 18-cv-1464 (DWF/TNL)


### NOTICE

**Filings Objections:** This Report and Recommendation is not an order or judgement of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).